After a seven-day trial, a jury returned a verdict on behalf of my client GlaxoSmithKline, finding that Teva had willfully induced infringement of Glaxo's method of use patent using carbidolol to treat congestive heart failure. In certain, with respect, certain limitations are included. Correct, Your Honor. It has, and it can be found at page 7 of the Blue Brief, if Your Honors would like to follow along all of the elements of the claim. Despite overwhelming proof of Teva's intent to induce and actual acts of inducement, the district court granted Jamal. And this, of course, the district court accomplished by not following the law of Acumen or Mara, where all of the evidence has to be viewed in the light most favorable to the non-moving party, i.e. GSK. And that it is a remedy that is sparingly invoked. The reason the district court granted Jamal is the district court found that somehow that the burden had shifted and that the burden had gone to GlaxoSmithKline to eliminate any other possible causes for doctors to be prescribing carbidolol to treat congestive heart failure. Can I, I mean, that's probably a major portion of this case, and it's very much, and you can, I think you would concede it's very much a circumstantial case. But your view is that applying that and inferences towards your side, you should have prevailed, the jury should stand. Absolutely, Your Honor. As I understand what the district court's view of it was, and obviously it's an experienced district court judge who sat through a lot of trials and a lot of jury trials. Even if we counsel, nobody's disputing circumstantial evidence counts, but this is not a case like a criminal case where there's no eyewitness, and so we have to rely on it. We usually see it come up in our inequitable conduct cases where there's no smoking gun, no admission by the party, so you need circumstantial evidence. Here, you did have doctors, and presumably a lot of them given the size of the damage award, and you did very much rely and try to suggest or think that you relied on your doctor having said he read the label, even though that turned out not to be so true. But in this case, based on the circumstantial evidence, I think what the district court was concluding was that all of the circumstantial evidence, or the circumstantial evidence and the inferences largely went against you. And that was for several reasons, because your doctor's testimony was that he relied on a whole bunch of other stuff outside of anything Teva did. The testimony was it didn't matter what Teva was doing, he didn't prescribe anything with regard to Teva, it was the pharmacies that did it. He even had no idea if it was going to a generic, which generic it would go to. So I think Chief Judge Stark, looking at that, said all of the inferences that exist point the opposite. So why don't you respond? I will, Your Honor. To be very respectful, Chief Judge Stark was wrong as to what our evidence was. Our evidence was actually that Dr. McCullough testified. We've got two periods here, the partial label period and the full label period. Dr. McCullough testified that he hadn't read Teva's partial label. And the reason he hadn't read it is that Teva had advertised to him in a press release that they had been approved for all uses. You're talking about the 2000 press release? The 2004 press release. And then in 2007... No, the 2004 didn't say it had been approved. It said it had been tentatively approved. The only press release that went to the approval of Teva's generic was the 2000 press release, right? Well, I would beg to differ. The 2004 said they had been tentatively approved for all uses and expected final approval in 2007. In 2007, they issued a press release saying, we have now final approval to market a generic version of GSK's cardiovascular drug, Corrin, which led Dr. McCullough to believe, and this is direct evidence, not circumstantial, that Teva had been approved for all uses because they had previously said they had gotten approval for all uses. Teva did nothing to disabuse him of that. And in fact, actually, in their product catalogs, which our regulatory experts said would be viewed as a statement that they had been approved for all uses, they directly compared themselves, their generic carbidolol, to Corrin. Wasn't the testimony, though, with regard to the catalogs? The catalogs weren't submitted to the physicians. The catalogs, I think your witness said, it's possible. I think that was the word. It's a possibility that a doctor would ultimately read something in the catalog, but not that the catalogs were submitted to physicians. Am I missing something? Yes, Your Honor. Actually, Dr. McCullough stated, rather unequivocally, that doctors were completely reliant on what they received from Teva. And if we look at Appendix 10610, 10611, 10612, he states that doctors have to rely on what the generics send to them, and specifically Teva. He said, I'm showing him something Teva said, where it says, the clinician must be familiar with the full product labeling provided by the manufacturer or distributor. Are we talking about the catalogs still, in the context of catalogs? And also the catalogs. He said he did. I was talking about the catalogs, because I'm looking at 685, 686, where the catalog lists products, and the people that Teva sells to are, as we talked about, the middlemen, the pharmacies, and whoever is in the supply chain. So Teva doesn't give this catalog to doctors, do they? And then he says, I think it does end up with doctors. This looks like a circular, you know, product catalogs, yada-da. And the question is, you think it is directed to doctors? The answer, I think it clearly could have been seen by doctors. So you were testifying this is actually given to doctors, or you just don't know? I don't know that. I think it's possible. That's the testimony I was referring to on catalogs. And then on top of that, Your Honor, there is, and I'm looking for my module on the full label, there is an actual book that Teva sends directly to doctors. And in fact, it says, Dear Healthcare Provider. And in that book, it specifically compares its generic carbinolol to Poric. So that's the full label. That would have been as of 2011. When was the switch from the skinny label to the full label? 2011 is when they went to full label. And in fact, if we look at appendix... What's the date on the book that they're sending it to doctors? We had 2011, and we had another one, I think, in 2012. So that's the full label. Which, by the way, even the judge found that that was not an inducement. When you had a full label teaching the doctor how to practice the method. And that's confusing to me in reviewing this whole case. Because normally, my own personal view would come to this, thinking there's some distinction to be drawn between the skinny label and the full label. But having read as much as I have on the case, that's not the way the case ran, right? It wasn't your view that... Well, you did say the label matters, but you didn't draw this... You weren't basing your case on the distinction. If not, you would have lost the first part of it. You want to... Correct. What we said is... Let's start with the partial label. That the partial label in and of itself contained enough information, just like in AstraZeneca, to induce doctors to infringe. But was there any... Please tell me the testimony that the doctors did use that label. We're talking skinny label now. That the doctors relied on the skinny label in their prescribing the drug that they prescribed. We have no direct testimony. We have circumstantial evidence that... Again, this is why I started. The circumstantial evidence that I know about is really... McCulloch was the main doctor here. And he's talking about what he used. But most compellingly, and I'll find it in a minute, that the automatic... No, when the generics launched, you switched your patients over, right? To the generic answer. No, I didn't actively switch. I continued to prescribe her. It was automatically switched. And he goes on to say, I did nothing different. The pharmacies, I don't know which generic they prescribed it to. But whatever it is, there's state law, there's pharmacy practices. And they'll take the same prescription that I had before and after their patent, which was 2008, after the generics launch. Right? Is that the testimony? Yes, but what the district court ignored, and what apparently we didn't do well enough in our brief, is point out the key language from Dr. McCulloch. Dr. McCulloch specifically testified at 11662 and 11663 that he didn't look at Teva's partial label, because Teva told him, prescribe our generic carbidolol just like Korreg. Well, Korreg was approved to treat congestive heart failure. I'm sorry, let me... I have this testimony marked. Now, before you start administering... So he says he didn't read... This is where he says explicitly, notwithstanding you're calling him back to say that he read the label, that he didn't read the label. And he says, no, I didn't. Why not? I just assumed they were the same. And then he says, what made you assume that? Firstly, the same as what? The same as Korreg, because Teva... You see, with the judges... Well, the compound was the same, right? I mean, that's why they got AB rated. Yeah, so... Correct. But here's what happened. We need to back up. Because he didn't read... But he didn't read... I'm sorry, I'll let you do this. But he didn't read the generic label. Isn't it kind of on him? I mean, the generic label... There were three indications for this drug historically, and only one of them was congestive heart failure. The label didn't cover congestive heart failure. Somewhere else, he also says, well, if I had read the label, I wouldn't have prescribed it because it was missing too much information. Right, so we need to back up, Your Honor. He said he didn't read the generic label because Teva had said, prescribe our drug just like Korreg. And what, unfortunately, the district court judge was conflating teaching a method of use, which is licensed. If you use Korreg to treat congestive heart failure, you're not infringing. And so what the district court said is, well, the innovator taught the industry how to practice this method of use. But that's not infringing. It's only when you have an unlicensed sale that you now get into infringement. The district court seemed to think that GSK had somehow induced doctors to infringe. Of course they couldn't. They wouldn't. They would never say, and by the way, use generic carbidolol to treat congestive heart failure. That was Teva who said, and use generic carbidolol just like you use Korreg. And doctors had already been taught to use Korreg to treat congestive heart failure. But can I look at the testimony you were just turning us to? Because the answer was, he says, I assume they were the same. And the next question, your question, what made you assume that? And the answer is, well, we have lots of information as we have gone over that indicated that, you know, it was a complete replacement. That, in fact, the two, the drug was the same. Well, the drug was the same, right? I mean, the patent was off the compound. The drug was the same. That's a correct assumption. And all the information regarding it was the same. I don't know what that means. But so what does that mean? What that means is, and what Dr. McCullough was referring to when he said we've already gone over it, is that he had been led to believe, and this is direct evidence of inducement. He, Dr. McCullough, had been led during the partial label period by Teva to believe that their generic carbidolol. How and why? Are we referring to the press releases now? The press releases, the product catalog. Well, the press release was 2007. So that was before the patent we're talking about, in this case, was even reissued, right? They put those press releases up on their website, and they're still there today. And so, and Dr. Is there evidence of that in this record that was in front of the jury? There was evidence that Teva put the press releases up on the website, yes. And they're still there? Obviously, we had to check before we wrote the briefs, but we couldn't check at that point in time. They specifically objected in their brief to your citation of that, and said that the jury had never been told that these things were still on the website, or had continued to be on the website. Or were on the website in 2007. They were put on the website, certainly, in 2007. And Dr. McCullough testified that he did look at Teva's website. Only except, but not when. And in fact, wasn't the discussion there, the download of whatever was on the website, was a 2015 date. So I didn't see any testimony about what he saw in 2007. And I don't know that he had, there was any testimony. Well, you see, this is how Teva is playing games here. That what we introduced through Dr. McCullough. I'm not playing games. I'm just trying to get to the heart of the record. Oh, no, no. I'm sorry. No, what Teva did, was they objected, as Judge Moore said, they objected about us saying that it was on the website. And at the trial, what we introduced was a screenshot from the website from 2015. And so they objected and said, well, this doesn't show what was on the website in 2007. And Dr. McCullough said, but the press release was in 2007. And I read the press release. And it led me to believe that Teva had said that for all uses. I'm not seeing that. I mean, I'm looking, you must be referring to 10-687. I just want to specifically understand what you're saying. And six, that's the, are we, I just want to make sure I'm looking at the same thing you're relying on in the record for what? You are, Your Honor. You didn't present any evidence to this jury about the website in 2007, did you? You know, I can't recall. I went over quite a bit. Well, this is the only picture of the website you put up, right? I believe that's correct. The only picture of the website is from April 2015, right? You don't know when it was edited before that, do you? Answer, no. I don't know how long it was up before 2015. Question, right. They may not have had a website in 2007, right? Answer, they may or may not have. You don't know? I don't know. So what are we supposed to take away from that? What we're supposed to take away from it, and this answers Judge Moore's question, at the trial, the screenshot was from 2015, that that 2007 press release was still on the website as of 2015. And I didn't mean to say Your Honor was playing games. What Teva tried to do is say, well, how do you know it hasn't been edited since 2007? Well, because the press release was issued in 2007. It says on the press release, issue date 2007. That's when they received their final approval. But we're talking about the website. And this was your witness's testimony about the website, not knowing whether they even had a website in 2007. Right. He certainly had to concede that. But now recall, the jury heard all of this. And they chose to find that we met our burden and were instructed by the court as to what they needed to find in order to find that we met our burden. And so while the district court may have found Dr. McCullough less than credible, that's not what one does in a JMOC, which is to weigh the evidence. But more importantly, and this is uncontested, Dr. McCullough said that had he known during the partial label period that Teva had not been approved for all indications, and he'd been led to believe by Teva that it had been approved for all indications, had he known it hadn't, he would have written dispensed as written, meaning there would not have been any infringing sales. Because then the pharmacy couldn't have substituted. And then they would have had to have given the doctor or the patient the actual innovator product of Coreg. And we had multiple experts testify to that. Teva's expert, Dr. Kinsey, testified to that. Our survey expert, Dr. Riester, testified to that. And so what would he have written in the prescription? Dispense as written. And that would have prevented generic substitution. And so he said, what is dispense as written? So we're sure his prescription would have included all the limitations on the patent and dispute? No. Dispense as written means you write Coreg, and then you say dispense as written. But the only inducement or infringement here is with respect to the claim. And the claim is quite limited and specific, as you know. It had to go through reissue with further limitations, right? So the infringement here is only with respect. It's a method of use. This is a method of use patent we're talking about. The compound patent is already expired, right? Correct. And so dispense as written, just to be technical, when a doctor writes Coreg for congestive heart failure, DAW, dispense as written, it means to the pharmacy, you can't swap it out. And Teva's expert testified to that at 11-076. Dr. McCullough testified to that at 11-662. Our survey expert testified to that at 10-750 through 751. And most importantly, Teva's 30B6 witness. And this is really important. She was asked this question. It's Miss King at 10-488. And so to make it specific to the issues here, if Teva has carved out congestive heart failure, but not hypertension, and not post-MILVD, Teva still expects to get sales where the doctor prescribed parvitalol for congestive heart failure, correct? Answer, yes, unless the doctor feels strongly. Question, rights brand only? Answer, yes. So Teva knew that if a doctor wrote DAW, they weren't going to get that sale. GSK was going to get that sale. And so they did everything in their power. Or any other generic, right? I mean, the FDA press release in 2007 said there were 14 generics. I can only count seven right on the record. But it wasn't, I mean, as Dr. McCullough said, the pharmacy switched it to a generic. And he has no idea whether it was Teva or another generic. Correct, unless he wrote dispensed as written. So my point is not that Teva versus another generic. I mean, Teva has like 45% of the market. The point isn't that Teva versus another generic would get the sale. The point is GSK would get the sale if the doctors had not been misled by Teva into believing that it had been approved, their generic parvitalol had been approved for all uses. Is there testimony about whether or not doctors read FDA press releases? Yes, Dr. McCullough said he does. Dr. Zussman said he doesn't. Dr. Zussman said he doesn't read anything. That's Teva's expert. Well, remind me not to go to him. Well, interestingly, Your Honor, in the Sanofi case, which was before this court, that same Dr. Zussman is testifying that doctors do look to drug labels for information about the use of the drug in special or specific populations, that it's important to look at the labels indications. This is the same Dr. Zussman. Well, we know the labels are important. You said to Judge Stark, no label, no inducement. So we all agree, you know, we can all agree with that. Let me ask you, the FDA press release comes out like one day before Teva's press release in 2007. Now, all of this press release activity occurs before the patent even comes out of reissue. So in order to even be considered as legally sufficient, it would have to be part of a pattern that existed after the patent issue. But let me ask you, was there anything in Teva's press release? My reading of the FDA press release is that it had a lot more stuff. Now, it didn't refer just Teva specifically, it referred to 14 generics that have this. But all of the stuff that you're concerned about, AB related, Core-Rig, all this stuff, that's all in the FDA press release too, right? I don't recall, I'd have to look at it. But I must say that Teva continued their marketing, very extensive marketing efforts well into after the patent issue. But there's another point I would like to get at because I'm concerned that we're- Because we are running out of time, but sure. So the partial label. The partial label itself, following the AstraZeneca opinion, contains enough information to induce doctors to practice the claimed method. Why do you need it? Why can't you just rely on the releases? We can, we absolutely can. But we also do have the partial label and we can't forget that. And this isn't a case like Takeda where we're talking about, oh, it doesn't really. Right, this is the partial label, 1.1 is heart failure. So Teva had carved that out. Now remember, up until two weeks before launch, they intended to capture the whole market. They intended to capture everything, including sales of congestive heart failure. Then they found out the other generics were going to do a carve out and get rid of 1.1. So they did two. They didn't change their intent. They still intended to capture the whole market. And if we look at- They took congestive heart failure off the label. Correct, they left on 1.2. 1.2 is left ventricular dysfunction, and this is at appendix 7665. Left ventricular dysfunction following myocardial infarction. Now, if we track it with the claim language, it says COREG is indicated to reduce cardiovascular mortality in clinically stable patients who have survived a myocardial infarction. Have left ventricular ejection fraction of less than or equal to 40% with, in this case, or without systemic heart failure. Now, Teva's own expert, Dr. Zussman, at appendix 11226 said, I asked him, is it your testimony that a patient who has left ventricular ejection fraction of less than or equal to 40% with systemic heart failure, would they be diagnosed as suffering from congestive heart failure? Answer, yes, as construed by the court. Okay, so this is about your overlap argument, that there was some overlap. Correct, Your Honor. The problem with that is there was no testimony about what those numbers were at all. Was there? I'm sorry, what numbers? Of the overlap. What percentage of people were overlapping or not overlapping? I don't know that there was- Could you present that to the jury? There was an actual percentage, but all experts agreed that- That some percentage, there is an overlap of some percentage. Correct. No. It would be patients who were suffering, who were symptomatic. They would be diagnosed as having congestive heart failure. And all of the up titration and the use with ACE inhibitors and so on, that was all on the partial label. It all stayed there. And Dr. McCullough walked the jury through it very carefully. And I can give the court the appendix citations, but they are in our brief. So that's the partial label. It's enough, the partial label alone is enough. But on top of that, we had the press releases. We had the marketing materials. We had the AB rated. We had Teva telling the industry, use arginine carbidolol just like Correg. Just like Correg means, use it to treat patients with congestive heart failure. So we have all of those together. And then we get to the full label, which of course is an exact copy of ours, which should have been more than enough to prove inducement. And yet the court found no inducement there either. Okay. We've probably exceeded our time on these. Thank you. Thank you very much. Good morning, Your Honors. May it please the court. You heard my friend on the other side say, I think five times, that Teva instructed doctors to use its generic product just like Correg. That statement does not appear anywhere in the record. It doesn't appear in the materials that my friend discussed this morning. Well, if it's just like Correg, why is it one making the next leap into it, and therefore patients and doctors are going to use it exactly the same way? You say, I'm sorry, Your Honor. You said, if they said it's just like Correg. Yeah. That's not what any of the materials of the record say. I mean, let me start with the press releases from before the patent had issued. Even they don't say, use just like Correg. My friend is drawing inference from the 2004 press release in which at the time Teva had said that when it launched, it intended to launch with a label for heart failure. Of course, it didn't do that. Okay, so hold on. The press release is on page 6347, so we're all looking at the same document. And that press release says, Carvodilol tablets are the AB rated generic equivalent of GlaxoCorreg tablets. So what does it mean to be AB rated? To be AB rated. Generic equivalent. To be an AB rated generic equivalent, which is the same language that FDA uses. AB rating means that it has been proven through studies to be therapeutically equivalent, meaning that it behaves the same way in the body within certain tolerances. Okay, well, they say it's the generic equivalent. So then it goes on and says, and are indicated for treatment of heart failure and hypertension. Hypertension was the earlier use. Heart failure is the new claimed use in the reissue patent, is that correct? Heart failure with some additional limitations. Congestive heart failure, yes. More than that. Reduced to reduced mortality with co-administration for more than six months. I'm sorry, I think we're looking at the, are we looking at the 2004 press release? Okay, I thought we were doing the 2007. I'm sorry, my bad. No, that's okay. The 2004 press release. In 2004, they did include the other, all the uses. Right, at the time, they had obtained tentative approval and said that they intended to market it in the future after the compound patents expired. And did Dr. McCullough expressly testify that doctors receive these releases and read them? Respectfully, no, Your Honor. First of all, they didn't, he testified generally about press releases, but not about, and I want to make sure I'm understanding your question correctly. That doctors receive press releases and read them. From generic, press releases generally from generics and from the FDA in order to, and he said, this is what he said, in order to determine when a product is going generic. That's right. What he didn't say is that they use press releases to determine what, how to prescribe their medications or what prescriptions to write. He did not say that it changes, that press releases are what determine doctors prescribing. Really, just out of curiosity, what was Teva's intent then when they issued this press release? Just goodwill, let the world know? Or to let doctors know so that they could prescribe this drug? So it was letting the world know that it had received this. Letting the world know that there is a new generic that can be prescribed for all of the identical uses that Coreg has been approved. No, Your Honor, because this is 2004 and Teva was not launching its product. This is three years before Teva launched its product. Okay, that we are attempting to seek and expect final approval in 2007 of a generic version of Coreg, which we expect it to be approved for all the same uses. Yes, at the time, that's what they expected. Okay, so this is what they've informed doctors. If I accept Dr. McCullough's testimony, which, since this is a jury verdict, I have to do. So if I accept Dr. McCullough's testimony that doctors get releases and read releases, in 2004, doctors would have gotten this release according to his testimony and read it. According to his testimony, doctors also would have received, in 2007, the FDA press release at Appendix 7116, which explained that the generics were not being approved for all of the indications in the label of the brand. And Dr. McCullough also said that if he'd read the label at that time, the carved-out label, then he would have concluded that it was, as he said, missing too much information to prescribe it, to prescribe Teva's generic for that purpose. So in 2007, there was another press release, correct? Correct. Of Teva. And that one says we have been approved, doesn't it? It does. Okay, so we've been approved. And what have we been approved for? It says to market its generic version of GSK's cardiovascular agent, Chlorhex tablets. Shipment will begin immediately. So to market its generic version, what does generic mean? A generic version means it's an ANDA, so it has been approved based on its bioequivalence to an already approved product. Okay, so they're now marketing a bioequivalent product of Glaxo's cardiovascular agent, Coric. So they previously articulated expressly what uses in the cardiovascular family it could be used for in 2004, heart failure as well as hypertension. Now they get a little bit more ambiguous, but they still say cardiovascular agent Coric. So your language was equivalent, can be used as an equivalent for the cardiovascular agent Coric. How would this not continue to potentially inform doctors that this drug could be a substitute for cardiovascular agent Coric full stop? So let me start with cardiovascular agent. A treatment for hypertension is a cardiovascular agent. Sure, that's why I said they got a little more ambiguous. Sure, right, I mean the other side places more weight on that phrase than your question does. But so in conjunction with this press release. Well, it certainly could be interpreted by someone. So couldn't congestive heart failure be understood to be a cardiovascular condition? I think that. I think the answer to that's got to be yes. Sure, but for the other side to place any reliance on this, they have to show. So if congestive heart failure could be understood to be a cardiovascular condition, then when someone says you can use my cardiovascular agent, your point is lost on me. This is a jury trial. The jury had all this in front of it. It got to make a fact finding. We don't step in the shoes of the jury. Indeed not, Your Honor, but what you take is all of the evidence, all of the evidence, including the admissions made by GSK and all of the failures of proof  So GSK had said to the district court in mid trial that it would recall the doctor to testify that he read generic labels. This is labeling. I haven't even mentioned labeling. I'll tell you what. One thing Chief Judge Prost said earlier is well, labels are important. We can all agree on that. I don't agree. I do think they can be important, but I don't agree they always have to be. I'll tell you right now, I think the releases are enough. I think the releases present enough evidence when presented to a jury that could have sufficed even if the label had never said heart failure. Never at any point. I don't care what the skinny label even says. I think the releases are enough in a jury trial for the jury after Dr. McCullough says I read releases and then I act on them. No, respectfully, Your Honor, he did not say and then I act on them. That's not what he testified to. That's what the other side would like you to get out of this. That is not his testimony. His testimony was that he read press releases to determine when products were going generic. And he also said, I believe in the very same page, referring to the FDA press release at 7116 of the appendix, that doctors also read FDA press releases. And here the FDA press release makes clear so that you can't just take the Teva press release in isolation without the same day. I understand. That's called competing evidence. And that's what a jury gets to look at and make a determination about how a doctor would be influenced. I don't think, so first of all, it has to be that Teva influenced doctors during the life of this patent. And I think your question in the top side of the argument asked, is there any evidence in the record that this- A screenshot was presented to the jury that in 2015, these press releases were still on the Teva website. That's not correct, Your Honor. That's not correct? That screenshot is not of the press release. So- What is it a screenshot of? It's a screenshot of another thing from Teva's website, a different exhibit that refers to generic carfetolol. Are you saying the jury was never made aware that Teva put press releases on its website? I am saying that. The jury was never told Teva puts press releases on its website in any way, shape, or form? Never. Okay, but even if the jury wasn't told that Teva puts press releases on its website, you've got a doctor that says we read them, that it influences us. Why can't the influence that occurred right beforehand, if not retracted later, especially when combined with all the prior, the future marketing efforts by Teva, which touted its A-B rating, which you and I both agreed means therapeutically equivalent without condition, without limitation? I didn't say that without condition, Your Honor, because that's not correct. It's A-B rated, it's therapeutically equivalent as labeled. As labeled, that's what it means. Therapeutically equivalent labeled? Okay, so then how about the full label period? So that would be a different case, and I'm happy to turn to- No, that's this case. Respectfully, Your Honor, I'm not sure what you wanted to talk about, the press releases. If we want to turn to the full label, GSK had an opportunity to prove, and I think as the Chief Judge's question brought up- To the jury, they had an opportunity to prove. Yes, they had an opportunity to prove to the jury. And they did, based on the jury verdict. We're not, well- What do you mean you're not sure? The jury found for them. Sure, the jury returned a verdict in their favor, yes. I'm not here to dispute that, but- Seems like a good choice. The evidence was from all sides' experts, including Dr. McCullough, that nobody's prescribing behavior changed when the label was changed in 2011, because the doctors had had the benefit of not only 10 years with GSK's product, which had become the standard of care, and Dr. McCullough agreed that the American College of Cardiology guidelines and the other professional- I am quite frankly baffled. I can't imagine a stronger case for induced infringement. You've got a label telling people to admit it, telling doctors to give it for congestive heart failure. You've got press releases by the company repeatedly saying either give it for heart failure or it's equivalent to things you should give for heart failure. You've got product catalogs that say we are AB rated with Coreg, which means we are equivalent. I can't for the life of me, at least for the full label period, imagine a stronger case for inducement. And so the jury found, not at all to my surprise, that there was inducement here. And it got flipped on J-Mall, and I'm just bewildered as to how you accomplished that. So a couple of things, Your Honor. So first on the full label, the full- this would have been a different case if TEVA had launched with the full label as opposed to switching to the full label four years- The jury was given both periods separately on interrogatories. That's right. And it was instructed for both periods that it had to establish the TEVA as opposed to other factors, that's the language of the jury instruction, had caused the infringing behavior by the doctors. And the evidence for the full label period was that doctors did not change their prescribing behavior. TEVA's market share did not go up at the time it changed its label, it went down. GSK's market share did not change at the time that TEVA and another generic switched to a full label in 2011. So I think it would have been a different case if TEVA had launched with the full label, but it didn't. And- You said 2009 meant 2011. I did, Your Honor, thank you. So, and the other point I wanted to make, because in response to your point about this being a strong case because it was A-B rated, everyone concedes, both sides agree, and Ms. Brooks conceded this in her argument to the district court at J-Mall five times, that launching with just hypertension, a certain label just for hypertension would not be inducing, would not violate anything. And the A-B rated language would have been exactly the same for products labeled for hypertension. They would still have been A-B rated. But when you say she said this, the district, she didn't say this to the jury. She never told the jury, did she, that launching with just a label that doesn't say CHF would have not been inducement, did she? Did she say that to the jury? You said she said it five times to the district court. She never said it to the jury, did she? Right, they've taken the legal position that- It's not a legal position. I think that's where we differ. It's a factual position. The factual position is, is there substantial evidence upon which a jury could have concluded there's inducement? And inducement is a question of fact. So the question of fact that went to the jury is, is there inducement? I think the jury could have concluded it based on the releases alone. It does not matter to me that she argued her position poorly to the district court judge in a legal discussion, because this is a fact question. And the jury was free based on the jury instructions. Jury instruction didn't say it has to be in the label, did it? The jury instruction did not say it had to be in the label. Correct. So the jury could have rightly concluded under my view of the law, which we'll say is the correct one, the jury could have rightly concluded that there was inducement presented based on all of these facts. Right, but- And it's pretty much irrelevant what she argued to the judge in Jay Mall. Well, but Your Honor, I just point out, in your question, you pointed on your view of the law. And I guess I'm pointing out that that's not GSK's view of the law or our view of the law, because the law of how carve-outs operate- Wait, your view of the law is for someone to prove induced infringement, there has to be a label. It wouldn't be enough. Suppose there were 10 press releases, all say, use it for hypertension. There still has to be a label that, I mean, use it for CHF. There still has to be a label that says it? No, I'm not saying that. Okay, so the label doesn't have to be present for a fact finder to conclude there's inducement if there's other evidence. I'm zeroing in respectfully, Your Honor, on the point that you made about AB rated generic equivalent. And all of that would have been exactly the same under a label. Set the press releases aside for a moment. I understand why that's different. But all of the evidence that actually is from the period of time when the patent was in force, all of that, referring to AB rated generic equivalent, all of that would have been exactly the same under a label, a partial label, that everyone would have agreed is not inducing. And that all of the same sales- First up, she does not agree that the skinny label is not inducing. No, a hypertension only label. I've never, GSK doesn't, literally doesn't have any- Would the label have the words only? It would have, the only indication in that label would have been hypertension. In other words, everything else would have been carved out. Well, you guys can all agree to that, but that's not the law. Can agree to what's not the law, Your Honor. You can agree if you want, that if the label only says the word hypertension, not only hypertension, that maybe that wouldn't have amounted to inducement, but that's not the law. That's not the law. The law is inducement can be determined based on circumstantial evidence, which can go to a jury. And if there was no label, or if the label just said hypertension, but yet all of the press releases and Teva's clearly expressed intent was to tell the world, oh, you can also use it for heart failure. That could have been enough, even if the label just said the word hypertension. As I said, Your Honor, I agree that the press releases are different, but let's go step-by-step. So the scheme- But we have the press releases here, so you can't sort of exclude them from the body of evidence. Respectfully, Your Honor, I absolutely can because they are not from the time period when GSK had the patent. This patent issued in 2008. There is not a shred of evidence that anyone saw these press releases during the time period when the patent was enforced. None. None at all. I'm sorry, what was the time period you said? These press releases are from 2004 and 2007. This patent issued in 2008 and then expired in 2015. So this trial occurred after that. So why couldn't these press releases, which doctors read and influence their prescribing descriptions, when not recanted at all, when there's product catalogs that come out and advertising thereafter talking about how we're AB rated and we're a generic equivalent of Core-A in the abstract, why isn't that enough? The AB rated is not enough, I think, for the reasons that I've been trying to give, that any therapeutically equivalent product, whether or not anyone is trying to get it to be marketed for the carved out use, that's still AB rated. Marketing something- But we know here Teva's trying to get it to be used for the carved out use because there's a mountain of evidence that says so. So then when they further say AB rated on top of it, I mean, maybe AB rated standing alone all by itself with nothing else wouldn't be enough. Maybe a jury would reject that. That would, of course, be up to a jury, not up to me. I don't think so, Your Honor. I don't think it would be sufficient for, I don't think a reasonable jury confronted only with a skinny label and AB rating could return that verdict. That would not be within the bounds of what a reasonable jury could do with nothing else. Now, GSK, I think, decided to put on a case that was not focused just on that. They decided to add all these extrinsic things, and I think your questions appropriately focus on those. You mentioned the catalogs. GSK attempted to, but did not show, that doctors rely on the catalogs. I think the Chief Judge's questioning brought this out in the top half of the argument. That's just not what- I have your argument. Why don't you, for just a minute, talk about the Lost Prophets case, please? Sure. Is that okay? Yes. Be happy to, Your Honor. So my friend on the other side said in the top half of the argument that this is basically about whether GSK would have captured these sales. So that even if, assuming that they've shown that- But your argument, as I understand it, is GSK wouldn't have captured the sales. They would have gone to other generics, not Teva, if Teva had been pulled off the market. But if the argument is that those other generics would have been infringing alternatives when they were being prescribed for CHF, then how is that relevant under Panduit? So under grain processing, you look at what steps can be taken to avoid infringement. And the step that I think, as you and I have been talking about, Your Honor, that every one of those generics could do to avoid infringement is simply to launch with a hypertension-only label if GSK had asserted its position that a carve-out that included the post-MILVD indication infringes, then they could have carved out further. They could have carved out down to hypertension. And as a consequence, all of the sales, when a doctor writes either Corig or Carvitolol on a prescription pad, and that goes to the pharmacy, under generic substitution laws, those would all have been filled by the available generics. And that would be an act of infringement. No, Your Honor. Really, they have a patent. They're the exclusive use of this drug for congestive heart failure. So if a doctor prescribes a generic for congestive heart failure, isn't that a direct infringement, an act of direct infringement? So GSK would be entitled- That's a yes or no question. If they have a patent, exclusive rights, on the use of this drug for congestive heart failure, if a doctor then prescribes a generic for congestive heart failure, is the doctor directly infringing their patent? If the doctor prescribes Carvitolol for- Correct. Which it doesn't have to be prescribing a generic because doctors don't prescribe generics for- No, they just use the word Carvitolol, and that would be sufficient. Yeah, so that would be an act of infringement. But the question is whether GSK would have, is entitled to any more than a reasonable royalty for that. So therefore, every sale by a generic, which has been prescribed for the purposes of congestive heart failure amounts to an infringing sale. Every sale, you just admitted that if a doctor writes a prescription to use Carvitolol for congestive heart failure, and if a generic is used to fill that prescription, that amounts to infringement. So every sale by the generic for that use amounts to infringement. So those are all infringing sales. Under Panduit, those are not to be considered when you're assessing lost profits. Look, the fact that GSK only has a small percentage of this market compared to 100%, and I mean for the CHF use, obviously. All the other uses were long since off patent. So the fact that they only have a small percentage because eight or 13 generics infringed their patent, I don't see how in the world the argument by you could be, other people were infringing too, so we shouldn't be liable to them for their lost sales by us. So a couple of points, Your Honor. So you asked, would it be an infringing sale? So the doctor is committing an act of infringement by writing the prescription, but of course the doctor isn't selling the drug, right? So the question is, are any of those sales caused by inducement? And in order to avoid overcompensating GSK, so under grain processing, How are they overcompensated when you have to pay them 100% of their lost profits on only the drugs you sold wrongly? How are they overcompensated? They're overcompensated, Your Honor, because as the statute says, they're entitled to compensation for the infringing use. Correct, as defined by, and we went further. We then have Panduit and a million cases thereafter that have articulated a four-part test for how we assess lost profits. What the court has also said, first, that Panduit is not used in all cases. Second, that Panduit is ideal for- Did you object to its use in this case? Did you object to the jury instructions? And did you appeal that objection? Yes, yes, and yes. So we moved for summary judgment. In order to have this discussion that you and I are having, in order that that could be passed out before the jury through competing experts, the district court excluded our evidence and granted partial summary judgment, sorry, and denied our motion for partial summary judgment. We preserved an objection to all of the jury instructions based on the positions that we had taken at summary judgment. And we filed a notice of cross-appeal on a brief in this court. So yes, yes, and yes to all of your questions. I understood your cross-appeal to be that the infringing sales by generics somehow don't affect lost profits analysis. So that when generics are not, when generics have a product on the market that is lawfully labeled for a non-infringing use. And what about the ones on the market during the time period of the full label? So, but that's not the question. Because the, we always- You presuppose it is lawfully labeled for other uses. No, I'm not. We're talking about the but-for world. We're talking about what would have happened but-for the circumstance that labeling your product as the generics did, either during the partial label period or during the full label period is infringing. And under green processing, what you look to is what steps the generics could have taken the here, the accused infringer could have taken to avoid infringement. And simply by changing a label. And we're not just talking about Teva. We're talking literally about any one of the eight generics that launched during this period. If GSK had asserted its patent, everyone had carved out even further down to a hypertension label. GSK would not have captured any of those sales. That's why GSK is entitled to a reasonable royalty- Wait, why wouldn't GSK capture any sales of the product for CHF? Because if a doctor writes a prescription or take this twice a day for CHF, you know, and gives the how many milligrams and so on, they take it to the pharmacy and it's filled. Even if a generic, you know, let's take Teva out of the case. Even if one of the other generics has labeled- Each of those would be an active infringement. No, Your Honor. Because that other generic is not- Whether the active infringement is by the pharmacist who substitutes the drug he's not allowed to give because there's patent protection, whether the active infringement is by the doctor who writes the prescription in a manner to cause the generic to be substituted, or whether the active infringement is by the company that is selling it, encouraging people to use it for this purpose. All of those amount to acts of infringement. So none of them should be carved out when you're considering what the pool is for damages. I don't understand. I really- Your argument boils down to you want other generics who are also infringing. You're saying they would have gotten the sales, not Glaxo. I don't doubt you that that's what would have happened in the world, but all of those are infringing sales. So they're not relevant for lost profits. They're not infringing sales, Your Honor, because a sale- No one is being sued for infringing for selling or offering to sell, right? To use the words of the Patent Act. The act of infringement is practicing steps of the method. So there is not an infringing sale. The question is whether the sellers of the product that wind up being administered to the patient, whether they are complicit in the infringement, either from contributory infringement, which we know doesn't work here because only 17% at the maximum of uses are infringing, or through inducement. And so when you have generics on the market that have not been accused of inducement, that didn't issue press releases or anything of that sort, but that's the but-for world that we wanted to prove to the jury existed, and we were not allowed to do that because of the perception, as you're asking me about, that every- Because the district court judge had the same misperception that I do about what Panduit says and what the law is. That's why you weren't allowed to do it. Right, the district court relied exclusively on Panduit, and we are asking the court to look to its own cases, including BIC, that say that Panduit is not the beginning and end of the analysis. Thank you. Thank you. Very briefly, let's start with the website, Appendix 10991. Teva's witness, Collier, was asked the following question. So okay, so Teva had a website in 2007, is that correct? Answer, correct. And as part of the launch in 2000- Sorry, but you got a 10 what? 10, I'm sorry, Your Honor, 10991, Appendix 10991. And as part of the launch in 2007, you added Carbidolol product information to the website. Answer, that is correct. Question, and it's also true that that would have said that Carbidolol is a generic to Coreg, right? That information would have been there. Answer, yes. Question, all right, and it would have said that Coreg is AB rated, right? Answer, yes. Question, and it's also true that that website would not have said that Coreg or Carbidolol was not indicated for congestive heart failure. Answer, that was not one of the improved indications in 2007. Question, but the website did not say that, did it? Answer, it did not. The jury heard that testimony. They heard the testimony of Dr. Litson. Yes, but I'm sorry, but I'm gonna derail you because you told me that there was a snapshot from 2015 that was presented to the jury that indicated these releases, that's what we were talking about, were still on the TEPA website, at least as of 2015. Were you mistaken? Did I misunderstand you? No, I'm not mistaken. We're still looking for it, Your Honor, because the cross of Dr. McCullough was, well, look, this snapshot was from 2015. How do you know it hasn't been edited since the press release came out in 2007? So we are continuing to look for that site. Because he said that you were unequivocally misspeaking or wrong when you said that. I know that I'm not because we, in our brief, showed the court, that obviously is not trial record. In our brief, we showed the court that those press releases are still on the website. And we add a link to our brief to that effect. Showed the court or showed the jury? Both, we showed the jury in 2015 and we're looking for that site, Your Honor. And in our brief, we showed this court that they're still on the website as of the time of the writing of the brief and we attached a link. But that's not relevant if it wasn't before the record. I understood, Your Honor. That's why we're looking for the other citation. But to go back, and my colleague here is, we'll find it before I finish and I have very little time. So what also the jury heard, Dr. Litson testified at 10.545. Does the FDA take any positions about product comparison? Answer, yes. The agency's general position is that if you compare one product to another by name, you are implying the use of the product. The jury also heard evidence at Appendix 11659 and Appendix 11660 about the 2007 press release. Dr. McCullough was specifically asked, now what did that tell you, referring to the press release, Dr. McCullough and your colleagues as a physician about what Teva's generic carbidolol, what indications it could have been used for? Answer, it could be used for all indications. Question, would that include heart failure in your mind? Answer, sure. Question, well I don't see the words heart failure in this particular press release. What made you think that Teva's generic carbidolol had been approved for the treatment of congestive heart failure? Answer, the use of the term cardiovascular agent. And then if we go to Appendix 11661 and 11662, Dr. McCullough was asked, so do you or do you not rely on the information you get from the generic as to whether or not they are truly a generic equivalent of the original brand? Answer, we are completely reliant on what they provide to us. That's what the jury heard. The jury also heard at Appendix 11656 as far as the 2004 press release. I said, we don't want to reinvent the wheel here. Did you actually, is your testimony that you actually saw this press release, is that right? Answer, yes. Then we go to Appendix 10670 on cross-examination. Dr. McCullough was asked, and you think that doctors would have seen this press release, right? Answer, yes. Because doctors, question, because doctors care when generics get launched because it saves their patients money, right? Answer, yes, I agree with that. Jury heard all of that, hence why they returned the verdict they did. Counsel then switches to the full label and the explanation for why that's not inducing is because Tebbit's market share did not change when they went to full label in 2011. That actually just shows you that Tebbit had already induced doctors to prescribe generic carbidolol for the treatment of congestion. This is about the labels? Okay, so I just got, you're way ahead of me, which is fine because you've got limited time, but I'm looking at 10670 and 10671. And 10671 looks to me like Dr. McCullough is saying he looked at, for Teva's product, right? You haven't analyzed the labels of any of these other generics. You don't know what they say, right? Well, in the context of my work in this case, Teva is the generic company, so I have reviewed your label, right? Yeah, but I was actually signing the press release test and winning on the previous page. I'm sorry, I thought you were signing. Yes, at page 10669. This is on cross-examination. He's shown the press release from 2007 on cross. And he's asked, and you think, on 10670, and you think that doctors would have seen this press release, right? Answer, yes, because doctors care when generics get launched because it saves their patients money, right? Answer, yes, I agree with that. And so, even on cross, he said doctors look at press releases including him. To just address the last comment by counsel as to why Teva's market share did not increase when it went full label in 2011, that is proof, actually, that they had already successfully induced physicians to prescribe generic carbidolol to treat congestive heart failure as early as 2008, which is when the patent issued. Thank you. Oh, and Your Honor, here we go. Thank you. It's appendix, as far as it being up on the website, it's appendix 6353. And it's September 6, 2007, it's up at that, so I'll let the court get to that so everybody can be on the same page. Your Honors, don't mind that I'm into my time here. It's appendix 6353. That's the 2007 release. Yes, Your Honor, and if you look at the bottom right, it shows April 14, 2015. I see, so that's when, that is the evidence, this is the actual document that was presented to the jury and it shows that it was pulled from the Teva website on April 14, 2015. Yes, Your Honor. So the jury had in front of it very clearly the idea that as of 2015, this release was still accessible on the Teva website. Correct, Your Honor. Got it. Thank you. And I think the exhibit number actually is in the preceding page, it's 6352, is the actual exhibit number. Thank you very much. So since, as far as I can tell, we haven't heard anything on the cross-appeal, that time's gone. Thank both sides and the cases.